SAUNDERS, Judge.
This is an appeal brought by Patrick “Dale” Kelley, ’ plaintiff-appellant herein, from the trial court’s judgment in favor of Kelley’s prior employer, Louisiana Limestone Aggregates, Inc. and Cyprus Industrial Minerals Company, defendants-appellees herein. The trial court dismissed Kelley’s suit against his employer for supplemental earnings benefits and medical expenses incurred after July 6, 1984, finding that they were unrelated to his on-the-job injury sustained February 6, 1984.
In his appeal, Kelly claims that he is entitled to supplemental earnings benefits after August 20, 1985, his last day of work, and medical expenses after July 6, 1984.[1] We find manifest error on the part of the trial court and thus, we reverse.

FACTS

Plaintiff was employed by Louisiana Limestone as a heavy equipment operator and general maintenance man. He loaded trucks with rip rap and limestone using a Caterpillar 966-C front end loader and at times, a D-6 dozer. The front end loader weighs 40,000 pounds and handles 12,000 to 15,000 pounds per bucket. On February 6,1984, the day he was injured, he had just finished loading rip rap onto trucks from a barge. As the barge he was on was unloaded, it rose in the water as it became lighter. In the past, a ramp had been built after the loading process to allow the machine to get off the barge safely. To save time on this occasion, he was told to “jump” the machine off the barge. He did as .instructed. In backing the machine off, it fell between 3½ and 4 feet, jarring plaintiff severely. His back began hurting the following morning and he reported his injury to his supervisor.
After plaintiffs injury in February of 1984, Kelley returned to work at Louisiana Limestone on July 6, 1984, after being released to return to work by Dr. Shamiah and Dr. Bauer and worked until August of 1985. The trial court, in its reasons for denying plaintiff relief, essentially found that Kelley failed to prove that his complaints of pain and/or injury after July 6,1984, the date he returned to work, were related to his work related injury.
As stated by the trial court:
“It is evident that any problems plaintiff had after terminating his employment in 1985 was [sic] not related to his on the job injury.”
Based upon this finding of fact, the trial court denied medical benefits after July 6, 1984.
We find that the trial court erred in finding that plaintiffs disability as of August 1985, which resulted in his employment termination, was unrelated to his injury of February 1984.[2] We find that Kelley carried his burden of proving by clear and convincing evidence that he was working in pain from July of 1984 until August of 1985 and that his disability in August of 1985 and thereafter was causally related to his back injury of February 6, 1984. The fact that plaintiff suffered continuously since his February 1984 accident appears clearly from the record. He continuously sought medical treatment and was continued on medication. Accordingly, a detailed review of his medical history is warranted.
MEDICAL HISTORY FEBRUARY 6, 1984 — ,JULY 6, 1984
The record reveals that Dr. Antonio Romero first prescribed medication for plaintiffs back injury and accompanying cold and flu symptoms on February 7,1984. Dr. Romero examined plaintiff on February 13, 16, 20, April 17, 30, May 2, 7 and 21 of 1984 regarding Kelley’s back pain. The record does not contain a summary, deposition or live testimony of Dr. Romero, however, Dr. Romero’s *831 records show findings of spasm on February 16, 1984, and on April 17, 1984. Dr. Romero diagnosed plaintiff as having lumbosacral strain and/or low back syndrome. It appears that plaintiffs final visit to Romero in 1984 was on May 21, although plaintiff filed a prescription for Norgesic Forte prescribed by Dr. Romero on May 25.
Dr. Looney, a family practitioner in Lake Charles, first saw plaintiff by referral on February 21, 1984. He treated Kelley conservatively with muscle relaxers. Dr. Looney’s report states that plaintiffs X-rays were normal and that the physical examination was “not remarkable.” Plaintiff returned on February 23, 1984, at which time he saw Dr. Stagg, Dr. Looney’s partner. Kelley testified that he was not examined by Dr. Stagg.
Kelley saw Dr. Gunderson on February 28, 1984, via referral from Kelley’s family physician, Dr. Romero. Dr. Gunderson, an orthopedic surgeon, did not note any spasm in Kelley on February 28, 1984. Gunderson treated plaintiff conservatively and referred him to physical therapy for two weeks. Plaintiff returned on March 13, 1984, with persistent complaints of pain. Dr. Gunder-son again noted no spasm on this date. On April 3,1984, plaintiff again saw Dr. Gunder-son.[3] On the April 3,1984, visit, Kelley could not bend straight forward, but had to bend to the side. The right extensor hallucis longus (muscle that raises the big toe) had some diminished strength and the straight leg raising test was positive on the right at 50 degrees.
On April 10,1984, Dr. Gunderson admitted plaintiff to Lake Charles Memorial Hospital where he underwent a lumbar myelogram and an EMG which were both normal. Plaintiff also underwent a CAT Scan which revealed a mild bulging at L5-S1. Dr. Gun-derson stated that on a scale of 1 to 5, plaintiff had a grade II bulge at L5-S1.
On May 4, 1984, plaintiff again saw Dr. Gunderson. Although Kelley stated that he was worse, Dr. Gunderson’s notes reflect that Kelley had no spasm, walked normally and could bend over and touch his toes. He released Kelley to light duty work and told him to return in one month. Kelley did not return.[4]
In his deposition of January 2, 1990, Dr. Gunderson found it probable, with plaintiffs history of no problems before February 6, 1984, and continuous back problems since that date, that Kelley’s back problems were related to his injury of February, 1984. Gunderson did not feel that surgery would benefit Kelley. Essentially, Gunderson diagnosed plaintiff as suffering from a lumbar strain injury.
Dr. Fayez Shamieh performed the EMG on Kelley on April 10, 1984, at Dr. Gunder-son’s request. Dr. Shamieh, a medical practitioner specializing in neurology, testified by deposition taken February 15, 1990. The EMG was ordered to rule out nerve root irritation or disease, which it did.
Dr. Shamieh again saw Kelley on May 22, 1984, via a referral by Dr. Romero. At this time, plaintiff was taking Flexeril, a muscle relaxer, four times a day and had received physical therapy ten days before being seen by Dr. Shamieh. On May 22, 1984, Dr. Shamieh noted some spasm in plaintiffs back in the lumbar area but noted no other abnormalities.
Dr. Shamieh agreed with Dr.- Gunderson’s diagnosis of plaintiff as having a lumbar sprain and continued Kelley on muscle relaxers and anti-inflammatory medication, together with physical therapy.
Kelley returned to Dr. Shamieh on June 5, 1984, complaining only of stiffness in the mornings. Dr. Shamieh continued him on muscle relaxers and anti-inflammatory medication and physical therapy. Dr. Shamieh noted no spasm at this time. Dr. Shamieh again saw Kelley on June 20, 1984, with similar findings.[5]
*832 Thereafter, plaintiff returned to Dr. Sham-ieh on July 5, 1984, at which time his examination was completely normal and no muscle spasm was noted. At this time, Dr. Shamieh released Kelley to return to full duty and noted in his record that “it seems to me this patient doesn’t want to improve.” When questioned regarding this notation, Dr. Shamieh stated that it was unusual for him to make such a notation on a patient’s record, but that he wrote it because of Kelley’s attitude that, in spite of normal exams, continued medication and normal investigative studies, Kelley continued to complain and there was no basis for his complaints. He also noted that Kelley asked for pain medication so he prescribed a minor analgesic, Norgesic Forte.
Meanwhile, Kelley was seen by a chiropractor, Dr. Darryl Bauer, on April 17, 1984, approximately two months after his injury and continued to see Dr. Bauer in April, May, June and early July of 1984. Upon examination, Dr. Bauer found that plaintiff exhibited rotational subluxations on the third, fourth and fifth lumbar vertebrae in addition to exhibiting elevation of the left ilium or hip. Kelley’s orthopedic and neurological exams were all within normal limits, although some orthopedic tests caused pain. Dr. Bauer did find severe paravertebral spasm throughout the lumbar spine, mainly across L3, L4 and L5 and the hips.
Dr. Bauer testified that, on July 3, 1984, plaintiff asked if he could return to work and Dr. Bauer released Kelley to return to work on July 6, 1984, although Kelley was still experiencing paravertebral spasm in the lower back.
MEDICAL HISTORY JULY 6, 1984 — AUGUST 20, 1985
It appears that Kelley returned to full duty work on July 6,1984, after being released by both Dr. Bauer at plaintiffs request and Dr. Shamieh. Defendants contend that overwhelming medical evidence exists showing that no symptoms complained of by Mr. Kelley after July 6, 1984, were referable to his injury of February, 1984. Therefore, they contend, insofar as his termination from employment was not injury-related, he is not entitled to any worker’s compensation benefits beyond July 6, 1984.
A. July 6, 1984 — November 29, 1984:
Insofar as the evidence at trial revealed that the defendants paid the medical bills for services rendered by Dr. Gol, beginning September 10, 1984, and mileage to Dr. Gol’s Houston office, in addition to prescriptions prescribed by several physicians prior to November 29, 1984, there appears to remain no issue as to whether plaintiffs injury was work-related between July 6 and November 29, 1984. This is shown by the following correspondence of October 7, 1985, sent to plaintiffs attorney by Janette Bush, the Human Resource Manager for Cyprus Industries Minerals Company — Limestone Division: [6]
“Dale Kelley was released to return to work on July 5, 1985 [1984] by Dr. Fayez K. Shamieh. Dr. Gol stated in the October 3, 1984 report that Dale was able to work. Therefore, it has been determined that charges incurred after November 29, 1984, will not be compensable under Workers’ Compensation benefits.
Since medical charges incurred after November 29, 1985, [1984] to the present are not considered work-related, Dale should submit them to his group insurance carrier, The Equitable Life Assurance Society of the United States. Insurance claim forms are enclosed for his convenience.”
Kelley was sent to Dr. Foster by the defendants August 30, 1984, due to increased pain while working. Plaintiff testified that during this time his back did not feel any better, but it felt better to be earning his *833 money. He testified that Dr. Foster said he could not do anything because Kelley was working. Dr. Foster’s report summarized that plaintiff has continued working although with slight discomfort. He reiterated Kelley’s complaints which centered around the low back area and pain in the lower extremities. Dr. Foster stated that Kelley’s subjective complaint was that his back pain was of greater severity than his lower extremity pain. Dr. Foster examined only Kelley’s nervous system with normal results, except that he noted that Kelley “did have a very slight amount of pain to palpation of the spinous processes in the low back.” Dr. Foster’s impression was that Kelley had sustained a lumbar straining injury of moderate severity. He felt that Kelley’s subjective complaints outweighed any physical findings as he found no objective findings. Dr. Foster found Kelley sincere and felt that Kelley still had some slight residual from his straining injury, but not enough to prohibit him from continuing work. He prescribed Resto-ril as a sleep aid for Kelley which was filled on August 30 and September 30, 1984. Finally, Foster’s report revealed no significant findings that would prevent plaintiff from working in his usual occupation as a heavy equipment operator.
Additionally, for purposes of connexity, we note that between August 2 and November 21,1984, Dr. Snider prescribed nine prescriptions totaling 138 tablets of Percodan for Kelley. As noted earlier, Dr. Snider apparently prescribed these medications for something other than plaintiffs back injury insofar as Kelley is not claiming reimbursement for expenses related to Dr. Snider’s treatment. It is significant that the medications received by plaintiff from Dr. Snider, although not necessarily prescribed specifically for his back injury would, without a doubt, effectively aid plaintiff in pain control while working between August 2, 1984, and November 21, 1984.
Subsequently, Kelley was initially seen by Dr. Gol, a neurosurgeon in Houston, Texas, on September 10, 1984. Dr. Gol found a “fair amount of paralumbar muscle spasm with tenderness over the whole paralumbar muscle.” Dr. Gol noted that a normal myelo-gram and EMG had been done and that Kelley’s CAT Scan of the lumbar spine revealed “mild diffuse bulging at the L5-S1 level.”
Kelley was again seen on October 3, 1984, at which time he had improved considerably. When seen again on November 1, 1984, he had only minimal paralumbar muscle spasm. In his report of November 5, 1984, Dr. Gol reported that plaintiff would be continued on medications and was able to work. He added that plaintiff had definitely improved and therefore, had an excellent prognosis for recovery.
Dr. Gol saw Kelley again on November 29, 1984. At this time, Kelley told Dr. Gol that he was improving steadily and only took an occasional aspirin and had little pain. Dr. Gol stated that Kelley “shows minimal degree of muscle spasm in the low back, but he is working, and therefore, I have given him a supply and refill of anti-inflammatory muscle relaxant medication which will not interfere with his capacity at work.” No further appointments were scheduled at this time.
B. November 29, 1984 — August 20, 1985:
Defendants contend that, although they did pay plaintiffs medicals through November 29,1984, no further benefits are compen-sable as being related to Kelley’s February 6, 1984, back injury. This contention is based mainly on the fact that Kelley did not see his treating physician, Dr. Gol, from November 29, 1984, through June 20, 1985. Based on this alleged seven month gap in treatment, no benefits, medical or otherwise, have been paid Kelley since November 29, 1984.
Kelley’s list of medication reveals that he was on medication prescribed by Dr. Gol for several months after the office visit of November 29, 1984; a prescription of Dr. Gol’s having been filled by plaintiff as late as January 26, 1985. Therefore, it is clear that he was still being treated for the same back injury through January, 1985.
From February 1, 1985, through April 2, 1985, plaintiff filled three more prescriptions totaling 52 Percodan tablets, in addition to six prescriptions totaling 94 Fiorinal with Codeine No. 3 tablets from Dr. Snider. Al *834 though Dr. Snider was not necessarily treating Kelley for his back problems, again, we note that this much pain medication would certainly aid in alleviating Kelley’s back pain and obviate the need to see a separate physician during this time.
Meanwhile, on March 26,1985, Kelley purchased a prescription containing Codeine prescribed by Dr. Ashrafi, one of the doctors who did treat plaintiff for his back problems.
On April 8, 1985, Kelley saw Dr. Antonio Romero, at which time Dr. Romero’s notes reflect that he noted spasm in the paraverte-bral lumbosacral musculature and diagnosed Kelley as suffering from acute lumbosacral strain. At this time, Dr. Romero prescribed “Valrelease,” which Kelley filled.
Between Kelley’s visit of April 8, 1985, to Dr. Romero and his return to Dr. Gol on June 20, 1985, for his continuing back problems, Kelley again filled eight prescriptions for 124 Fiorinol with Codeine No. 3 tablets and one prescription for 25 Percodan tablets prescribed by Dr. Snider between April 10, 1985, and June 7, 1985.[7]
Kelley returned to Dr. Darryl Bauer, his chiropractic physician, on June 7, 1985. Bauer again found paravertebral spasm located in the lower lumbar spine. Additionally, Dr. Bauer saw Kelley on June 15 and August 23, 1985, at which time he gave Kelley a disability slip which Kelley gave to his supervisor, Dale McCormick. Dr. Bauer continued to treat Kelley intermittently up until the time of trial.
Dr. Bauer testified at trial that plaintiffs back problems were caused by the accident of February 1984 insofar as he had treated Kelley for sinuses and other non-back ailments in 1980,1981 and 1982 and Kelley had no back problems until the accident of February 1984.
Kelley returned to Dr. Gol, the neurosurgeon in Houston, on June 20,1985. Dr. Gol’s report reveals that he found “marked para-lumbar muscle spasm” upon examination of Kelley. Dr. Gol prescribed a back brace, anti-inflammatory muscle relaxants and pain medication and asked plaintiff to return in one month. Kelley returned July 15,1985, at which time he was still complaining of pain and did show a moderate degree of lumbar spasm. Kelley again returned on July 25, 1985, at which time he was no better. Kelley was again seen by Dr. Gol on August 12, 19, and September 3 of 1985, at which time he exhibited very little muscle spasm. Dr. Gol noted that Kelley stated that medication did not control all of his problems and therefore, he had tried chiropractic treatment, which also did not help. Dr. Gol prescribed Equa-gesic. Meanwhile, Dr. Pugh, a physical therapy specialist, had done an EMG on him with normal results. Kelley testified that his supervisor, Dale McCormick, was informed each time he had doctor’s appointments in the summer of 1985.
Kelley testified at trial that, although he returned to work in July of 1984, his back never quit hurting. Almost a year after returning to work, during the summer of 1985, due to better weather and therefore, more work, his back pain became worse due to his being on the machine more. By August of 1985, he could no longer get up and down off his machine. Kelley did not return to work after August 20, 1985. Although Kelley presented his employer with a disability slip beginning August 20, 1985, stating that he was unable to be gainfully employed at that time, he received neither compensation nor medical treatment after August 20, 1985.
The plaintiffs medical history, as thus detailed, shows no interruption in his medical treatment and shows clearly and convincingly that he was suffering substantial pain caused by his February 1984 accident continuously from that date.

POST-AUGUST 20, 1985 EVENTS:

Dr. Gol again saw Kelley on September 18 and 30,1985. Kelley was still complaining of the same pain and still showed quite marked muscle spasm. He was continued on medi *835 cation. Dr. Gol continued to treat Kelley through April 21, 1988.
Dr. Gol, in his deposition of December 1, 1988, testified that it appears that the degeneration of Kelley’s L5-S1 disc was probably caused by the accident of February 6, 1984, and was the cause of his present problems. Dr. Gol, in his report of April 1987 additionally found that the degenerative changes in Kelley’s back were the cause of Kelley’s spasm.
Dr. Bauer continued to treat Kelley in August, September, October and November of 1985 and in March, April, May and June of 1986. Subsequently, Kelley was not see again by Dr. Bauer until April of 1987, then in July and again in September of 1987. In 1988, Dr. Bauer treated Kelley in June, July, September and October. Kelley last saw Bauer in February of 1990.
The deposition of Dr. Dale Bernauer, taken March 29,1989, was offered and admitted into evidence by Kelley. Dr. Bernauer, an orthopedic surgeon, first saw plaintiff on May 28, 1986. We note that Dr. Bernauer did not detect spasm in his examinations of Kelley. Bernauer sent Kelley for several tests including a CAT Scan on May 29, 1986, a lumbar diseogram on June 11,1986, a MRI on June 14, 1986, and a myelogram on August 21, 1986.
Both the CAT Sean and myelogram essentially had normal results. The diseogram revealed some degeneration of the disc at L5-S1 and caused left leg pain. This finding was inconsistent with Kelley’s prior complaints of right leg pain. Finally, the MRI also showed degeneration at L5-S1, a decreased signal at L5-S1 and “some dehydration of the nuclear material.”
Dr. Bernauer last saw Kelley on September 22,1986. He diagnosed Kelley as suffering from degenerative disc disease at the L5-S1 level and recommended Kelley attend a chronic pain clinic. Dr. Bernauer’s opinion was that Kelley’s degenerative disc disease was a permanent disability and that, at the time he saw Kelley, Kelley was not capable of operating heaving equipment.
Kelley contends that his degenerative dise condition diagnosed in June and July of 1986, via the results of the diseogram and MRI, respectively, was asymptomatic prior to the accident and was aggravated by the accident. Drs. Bauer and Shamieh agreed that a degenerative disc condition would cause pain and discomfort consistent with plaintiffs complaints, particularly if there had been an injury to a disc which would be causing degeneration. Dr. Shamieh testified by deposition that chronic or repeated trauma or strain to the lower back could cause disc degeneration. Dr. Shamieh did agree, pursuant to questions propounded from plaintiffs attorney, that assuming Kelley had a degenerative disc disease and that the jarring of operating heavy equipment caused him to have severe pain in his back, Dr. Shamieh would not recommend that he continue to do the type of work which aggravated his back condition.

PENALTIES AND ATTORNEY’S FEES

Kelley began seeing Dr. Gol in September of 1984 and either saw or received medication from Dr. Gol until January 26, 1985. Dr. Gol’s bills were paid through November 29, 1984. Kelley returned to both Drs. Bauer and Gol in June of 1985. The record reveals that the defendant was aware of plaintiffs treatment by Dr. Gol and Dr. Bauer as of September 24,1985, shortly after Kelley’s last day of work, August 20, 1985.
Shortly thereafter, by letter dated September 24, 1985, defendant asked their company physician, Dr. C.J. Kluck, to review Kelley’s file “to determine if the ongoing problem is related to the original diagnosis caused by the work related accident in 1984.” Dr. Kluck responded to this inquiry on September 30, 1985, and relying on a report of Dr. Gol’s, which had noted that there had been a seven month gap in Kelley’s treatment, Dr. Kluck determined that Kelley must have sustained a new injury which had not been timely reported to his employer.
We note, however, that in this September 30, 1985, report, Dr. Kluck was aware of Kelley’s visit to Dr. Romero on April 8,1985, and additionally, was aware of the prescriptions from Dr. Snider which plaintiff had been filling between February 1, 1985, and July 8, 1985. As stated in his report of *836 September 30, 1985, “I believe a report from Dr. L. Snider would also be indicated particularly if Dr. Snider and/or Dr. Romero refer to his-back_”
Subsequently, on October 7, 1985, Janette Bush, defendant’s Human Resources Manager, wrote to Kelley’s attorney, stating in pertinent part:
“A letter by Dr. Gol dated 6/26/85 says that patient (Patrick Dale Kelley) returned on 6/20/85 after a lapse of about 7 months. ‘He told me that he has a recurrence of his back ache which radiates down to his right leg and this is aggrevated by jarring when working.’ According to our company physician who has reviewed this ease history, a lapse of 7 months would indicate a complete healing of the condition and a recurrence would indicate a new condition, which would indicate a new injury. Thera has been no report of an on-the-job aeci-dent/injury on or around June 20, 1985, by Dale that could be associated with his present condition.”
On October 8, 1985, Ms. Bush sent the following correspondence to Kelley:
“Dear Dale:
Your present condition has been reviewed by our company physician. It has been determined that this condition is not related to the injury you sustained in 1984. In addition, you have not reported being in an accident at work around June 20, 1985, the date you returned to Dr. Gol. Therefore, your present condition cannot be work related. As a result, it has been determined that you will not be eligible for Workers’ Compensation benefits.”
In response to an inquiry from plaintiffs attorney to Dr. Gol, Dr. Gol responded by letter dated November 4, 1985, as follows:
“In regards to your inquiry regarding Mr. Kelley, I think that it is reasonable to assume that the pain which he complained of when he came back in June, 1985, was a recurrence of the original pain since it was in the same distribution of the lower back and the right leg. Also, if you will recall at the end of November, 1984, he still had minimal muscle spasm; although, he was working. He may, of course, have some mild degenerative disc disease which is not apparent on the myelogram and this could make it possible for him to sprain himself as he had before.
It is, of course, not possible to exclude a new injury as the carrier suggested and, obviously, a new injury could cause such symptoms as he complained of, but then he did not give me any history of any new injury and, in the absence of any new injury history, I have to assume that the recurrence in the same distribution as originally is more likely to be a recurrence of an original rather than a new occurrence due to a new lesion.
As far as his disability was concerned, he unquestionably had marked muscle spasm in June, 1985, and moderate lumbar muscle spasm in July, 1985, and he still had some spasm in August, 1985, and then again in September, 1985, he still had intermittent pain and quite marked muscle spasm on September 18, 1985. In view of this, it is likely that throughout this period from June, 1985, to September, 1985, he would have had a considerable disability as far as manual work is concerned and probably would not have been able to do regular manual work because of the continuing muscle spasm. I have not seen the patient since September 30, 1985, and he does live in Louisiana. Therefore, his present condition is unknown to me.”
This November 4, 1985, letter of Dr. Gol was forwarded to defendants. In response, defendant, represented by Janette Bush, stated by memo dated November 8, 1985, to Mr. Loughrey, that:
“I am sending you information on the Workers’ Compensation claim for Patrick Dale Kelley. Kelley has obtained the services of an attorney, R. Layne Royer, who contacted us in September, 1985, about the payment of bills incurred by Kelley for a back injury. You will note in my response to the attorney that we denied payment of bills and Workers’ Compensation disability income to Kelley for an incident occurring this year. According to Dr. Kluck, the work-related incident in 1984 and the present incident are not related.
*837 It now appears to me from the attached letter of Dr. Alexander Gol, that the two incidents may be related. I have forwarded Dr. Gol’s letter to Dr. Kluck for his review and comment. I would appreciate your reviewing this situation also.”
Kevin Loughrey responded to Janette Bush’s memo on November 12, 1985, as follows:
“Workers’ Compensation Claim — Patrick Dale Kelley
I have reviewed the materials submitted to me by Janette Bush regarding Patrick Dale Kelley. Despite the opinion of Mr. Kelley’s doctor it seems to me that the case can be made that his disability is not job related and I believe we should have Mr. Kelley see a physician of our choosing for the purpose of making this determination. Assuming Dr. Kluck agrees, I would appreciate if you and he would work together to accomplish this.
/s/ Kevin Loughrey K. Loughrey”
This November 12, 1985, memo was routed to Dr. Kluck and Janette Bush to which Ms. Bush responded with a memo on November 15, 1985, to Mr. Loughrey stating that Dr. Kluck would make arrangements for Kelley to see a physician of their choice. Dr. Kluck also responded to Dr. Gol’s November 4, 1985, letter with a memo to Kevin Loughrey dated December 16, 1985, stating:
“In response to the letter from Dr. Gol dated, November 4,1985, he states T think that is reasonable to assume that the pain which he complained of when he came back in June, 1985, was a recurrence of the original pain, since it was in the same distribution ... ’ He then begs the issue by stating, ‘he may of course have some mild degenerative disk disease ... and this could make is possible for him to sprain himself as he has before. It is of course, not possible to exclude a new injury as the carrier suggested and obviously a new injury could cause such symptoms as he complained of, but then he did not give me any history of any new injury and the absence of any injury history, I have to assume that the recurrence in the same distribution as originally is more likely to be a recurrence of an original rather than a new occurence due to a new lesion’. It is unreasonable to assume that a condition that had disappeared would return without some cause. Therefore, to say that the recurrence is due to the original injury, is not logical. It also appears from the medication list, that there is another problem for which this person is being treated. Ostrearthritis and/or degenerated disk disease, are characterized by recurrent episodes of discomfort, whereas muscle strains and sprains heal and are not characterized by recurrent discomfort, unless a new injury should occur. One should emphasize the mention in Dr. Gol’s letter of degenerate disk disease as the cause.”
On December 16, 1985, Kelley was referred to Dr. Kenneth Veca in New Orleans for “an evaluation of a condition that may or may not be work related.” Kelley was examined by Dr. Veca on December 16, 1985.
On January 21, 1986, plaintiff was notified that due to the fact that Dr. Veca had found no objective evidence to substantiate plaintiffs continued complaints and could find no reason why plaintiff could not return to his full activities as a heavy equipment operator. Kelley was instructed to return to work on January 27, 1986. Kelley was officially terminated by letter of April 17,1986, for failure to return to work.
We find that the review of Kelley’s file carried out by a company physician, a physician who had never examined Kelley, resulted in an erroneous finding. This finding was that “a lapse of 7 months would indicate a complete healing of the condition and a recurrence would indicate a new condition, which would indicate a new injury.” Conversely, we find that Dr. Gol’s comment in his notes regarding his April 7, 1986, examination of Kelley the more correct factual finding:
“The patient was seen in the office again on April 7, 1986, and he has exactly the same complaints as he always had and in fact they have not changed since I first saw him, in September 1984.”
Upon close examination of the record, we find that there was, in fact, no gap of seven *838 months or any other significant period of time when plaintiff was not either being treated by a physician and/or under medication prescribed by a physician which alleviated his back condition allowing him to work in pain.
LSA-R.S. 23:1201(E) provides for the imposition of a 12% penalty on compensation which the employer/insurer fails to timely pay. These penalties are not to be assessed when the employee’s right to such benefits has been reasonably controverted. These penal statutes must be strictly construed. See Fusilier v. Liberty Rice Mill, Inc., 569 So.2d 1050 (La.App. 3d Cir.1990). Given the conflicting opinions expressed throughout the history of this case, we do not find that the imposition of penalties on compensation and medical benefits is warranted. Kelley’s right to such benefits was reasonably controverted.
Additionally, we find that due to the disproportionate amount of subjective evidence of Kelley’s disability in relation to the objective findings of Kelley’s physicians, the actions of the defendants were not arbitrary, capricious or without probable cause so as to subject defendants to payment of attorney’s fees. See LSA-R.S. 23:1201.2.

OUT-OF-STATE PHYSICIAN

Appellees argue that due to the fact that Dr. Gol is an out-of-state physician, they should not be liable for medical costs incurred by Kelley for treatment by Dr. Gol. Evidence regarding Dr. Gol’s treatment of Kelley was objected to at trial by defendant on this basis. The trial court overruled the objection and allowed the testimony. Defendants have not answered the appeal nor assigned this trial court ruling as error. Thus, the issue as to whether the trial court should have allowed evidence of Dr. Gol’s treatment of plaintiff is not properly before us.
As to defendant’s contention that they should not be held responsible for Kelley’s treatment by Dr. Gol because similar medical treatment was available in Louisiana, we find that this issue is also not properly before the court. Defendant’s contention amounts to an affirmative defense which must be set forth affirmatively by answer. LSA-C.C.P. art. 1005. No pleading filed by defendants has set forth such an affirmative defense. The issue was brought up in defendant’s brief, but this does not amount to a pleading and it is not the proper manner in which to plead an affirmative defense.
Likewise, we note that defendants paid for Dr. Gol’s treatment of plaintiff from September 10, 1984, until November 29, 1984, without question. Even if the affirmative defense was properly pled, in the interest of fairness, defendant would be estopped from withdrawing their tacit consent of Dr. Gol’s treatment of plaintiff without notice of such withdrawn consent to plaintiff.[8]
We also note that, although the evidence did show that a like physician was available in Lake Charles, when, in fact, defendants sent Kelley to a physician of their choice, he was forced to travel to New Orleans, a five hour drive or 300 miles from his home in DeQuiney. Conversely, Kelley’s trip to Dr. Gol required travel time of two and one-half hours from plaintiffs home. Apparently the statutory preference under LSA-R.S. 23:1203(A) that medical treatment should take place in Louisiana, if possible, is for reasons of economy. In this case, it was more prudent and saved the defendants financial resources to allow Kelley to receive his treatment in Houston, Texas, rather than in New Orleans, Louisiana.

DISCUSSION

LSA-R.S. 23:1221(3)(c)(i) and (ii), applicable prior to the 1985 amendment, stated:
(c)(i) Notwithstanding the provisions of Subparagraph (b) of this Paragraph, for purposes of Subparagraph (a) of this Paragraph, if the employee is not engaged in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, or is earning wages less than the employee is able to earn, the amount determined to be the wages the employee *839 is able to earn in any month shall in no case be less than the sum the employee would have earned in any employment or self-employment, as described in Subpara-graph (b) of this Paragraph, which he was physically able to perform, and (1) which he was offered or tendered by the employer or any other employer, or (2) which is proven available to the employee in the employee’s or employer’s community or reasonable geographic region.
(ii) For purposes of Subsubparagraph (i) of this Subparagraph, if the employee establishes by clear and convincing evidence, unaided by any presumption of disability, that solely as a consequence of substantial pain, the employee can not perform employment offered, tendered, or otherwise proven to be available to him, the employee shall be deemed incapable of performing such employment.
Kelley testified that he has returned to work as of May or June of 1989 as a dump truck driver under conditions much more favorable to his back condition. There was no evidence presented that Kelley was either offered or tendered employment by his employer or any other employer which he was physically able to perform. We find that Kelley has proven under LSA-R.S. 23:1221(3) (c) (ii), by clear and convincing evidence, that he is incapable of working as a heavy equipment operator due to substantial pain and therefore, cannot perform the employment which was made available to him by the defendant.
Based upon the foregoing, we find that Kelley is entitled to weekly compensation benefits beginning August 21, 1985, and continuing until that date when Kelley commenced employment at which time Kelley continued to be entitled to S.E.B. during the period of his partial disability.[9] Additionally, defendant is liable for unpaid medical expenses incurred after November 29, 1984, through the date of trial in the amount of $9,041.35, together with transportation expenses incurred through the date of trial in the amount of $2,160.70.
For the foregoing reasons, we reverse the trial court’s finding that Kelley failed to prove that his disability in August of 1985, which resulted in the termination of his employment, was casually connected to his work-related accident of February 6, 1984.

DECREE

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment is rendered in favor of plaintiff, Patrick “Dale” Kelley, and against defendants, Louisiana Limestone Aggregates and Cyprus Industrial Minerals Company, for workers’ compensation benefits beginning August 21, 1985, and continuing through Kelley’s total disability.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that plaintiff, Patrick “Dale” Kelley, is entitled to S.E.B. commencing in May of 1989, when Kelley commenced employment, to be continued during the period of his partial disability.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that plaintiff, Patrick “Dale” Kelley, is entitled to medical expenses in the amount of $9,041.35, together with transportation expenses in the amount of $2,160.70.
Costs to be paid by defendants. Expert witness fees for the trial testimony of Dr. Darryl Bauer will be fixed at $350.00 and the deposition testimony fees of Dr. Clark Gun-derson and Dr. Dale Bernauer will be fixed at $350.00 each and cast to defendant.
REVERSED AND RENDERED.
DOMENGEAUX, C.J., dissents and will assign reasons.
YELVERTON, J., dissents for the same appellate review standard reasons assigned by Domengeaux, J.

. It was stipulated at trial that Kelley’s employer paid medical expenses for Dr. Gol’s treatment through November 29, 1984.

. It appears undisputed that plaintiffs complaints until July 6, 1984, when he returned to work, were related to his on-the-job injury of February 6, 1984.

.Dr. Gunderson, in his deposition, states that he noted spasm in plaintiff on one occasion, presumably this visit, insofar as his notes reflect no spasm on other visits.

. Kelley testified that he attempted to return to light duty work in May of 1984, as recommended by Dr. Gunderson, but was told the company had no light duty work available.

. At this point, we note that on June 11 and 18th, *832 1984, Kelley purchased Percodan prescribed by a Dr. H.L. Snider. The record is silent as to the reason this medication was prescribed. Invoices were not submitted to defendant for payment.

. ■ Prior to Dr. Gol’s treatment, the medication lists reveals that on August 7, 1984, plaintiff filled a prescription for Equagesic prescribed by a Dr. Ashrafi. The record reflects that on November 20, 1985, the defendant’s paid Kelley for reimbursement of services provided by Dr. Ashrafi on August 7, 1984.

. We note that Kelley's medication list, referred to earlier, is missing those prescriptions prescribed between August 8, 1985, and January 6, 1986, although a few receipts are available for this period.

. Plaintiff's attorney was sent a letter on September 21, 1987, after Kelley had been treated for three years by Dr. Gol, stating that, "We feel that future medical treatment for Mr. Kelley should be obtained in this area.”

. It appears that Kelley's weekly compensation rate is $245.35 based upon an average weekly wage of $368.00.